**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

_____

**No. 97-31342**
_____

**JEAN BAILEY JONES,**

**Petitioner-Appellee,**

**versus**

**JOHNNY JONES, Warden,**

**Respondent-Appellant.**

_____

**Appeal from the United States District Court**
**for the Eastern District of Louisiana**
_____

December 16, 1998

Before JOLLY, SMITH, and BARKSDALE, Circuit Judges.

RHESA HAWKINS BARKSDALE, Circuit Judge:

For the conditional habeas relief granted state prisoner Jean Jones, serving a mandatory life sentence for heroin distribution, the critical question for her ineffective assistance of counsel claim is whether, at her half-day trial, deficient performance caused the requisite prejudice. We **REVERSE** and **RENDER**.

I.

At the end of October 1987, a Louisiana grand jury indicted Jones for distribution of heroin on 4 September. The charge carried a mandatory life sentence. In early November, the state trial court appointed Jack Dolan, with the Orleans Indigent

Defender Program, to represent Jones. That same day, Jones, through counsel, entered a not guilty plea and orally moved to suppress the evidence, her confession, and identification.

Approximately three weeks later, a hearing was held on the motions to suppress evidence and the confession. The record does not contain a transcript of the hearing; the minute entry reflects that the State called New Orleans Police Officer Overman as a witness. The motions were denied, but "the issue of identity of the confidential informant [was] left open".

Two weeks later, on 4 December, a hearing was held on the motion to suppress statements. (Although the minute entry for the previous hearing reflects that motions to suppress the evidence *and* the confession were heard and denied, the entry for the December hearing states that the subject of that hearing was the motion to suppress "the statements"; and that the motion to suppress the evidence was denied at the previous hearing.) There is no transcript of the hearing. The minute entry reflects that the State called New Orleans Police Officer Wethern as a witness; the defense, Jones. The motion was denied. The minute entry also reflects that Jones "re-urged" her motion to produce the informant's identity, whereupon the State advised the court that the informant would not be referred to in any further proceedings.

On 10 March 1988, Jones moved for a speedy trial. That June, the parties appeared for trial. But, the court was unable to seat

a jury; 39 of 45 prospective jurors were excused for cause because they were "unwilling to impose the consequences of a guilty as charged verdict". (Again, the heroin distribution charge carried a mandatory life sentence.)

Trial, held on 12 September 1988, lasted a half-day. It was stipulated that 46 pieces of foil were seized from Jones when she was arrested on 4 September 1987, and were tested on 8 September; and that 23 tested positive for heroin. Jones' counsel added that the other 23 were "bunk". ("Bunk" is a substance, such as sugar, which appears to be, but is not, heroin.)

The State called two witnesses in its case in chief. New Orleans Police Officer Polk testified that, while working undercover that 4 September, he was parked outside a fast-food restaurant in New Orleans at about 9:30 p.m. Other officers were in the immediate vicinity, observing him. While Officer Polk was sitting in his vehicle, Jones entered it. The Officer told Jones that he would like to purchase two "bundles" of "dope"; she replied that she would sell only one bundle at a time. (A "bundle" is approximately 30 shots of heroin.)

Officer Polk gave Jones $350 in previously photocopied bills for one bundle; it consisted of approximately 35 aluminum foil packets. Jones exited the vehicle, ostensibly to pick up the other bundle and return, whereupon the Officer was to purchase it for an additional $300. However, when Jones exited the vehicle, Officer

Polk flashed his lights in a pre-arranged signal to alert the other officers that the heroin and money had been exchanged. Jones was arrested and advised of her constitutional rights.

On cross-examination, defense counsel asked Officer Polk whether Jones appeared to be "intoxicated or maybe high on drugs". The Officer replied that Jones did not, but instead "seemed perfectly sane". He testified further that the deal had been made before Jones arrived; that she knew what was going on and why she was there; and that it "wasn't like ... I went out looking for her". Jones' counsel asked the Officer *whether he was "quite sure" that he did not instigate the sale or push Jones;* Officer Polk responded that he did not, that it was a pre-arranged sale.

The State's other witness was Officer Wethern. Prior to 9:00 p.m. on 4 September, he and his partner were conducting an undercover heroin investigation, and enlisted Officer Polk as an undercover agent. The officers made arrangements to purchase two bundles of heroin from a woman named "Jean" (Jones' first name) at a fast-food restaurant. For the purchase, Officer Wethern withdrew $700 from the narcotics fund, photocopied the bills for identification, and gave them to Officer Polk. He directed Officer Polk to the fast-food restaurant, and they arranged the signal for Officer Polk's having received the heroin. Officer Wethern and his partner were parked across the street. Five other officers were also assisting with surveillance.

At approximately 9:30 p.m., Officer Wethern observed a black female (later identified as Jones) arrive at the fast-food restaurant parking lot and enter Officer Polk's vehicle. After a few minutes, Jones exited, and Officer Polk flashed his lights. Jones was arrested. Officer Polk had purchased 36 packets. Officer Overman searched Jones and seized currency and ten additional foil packets of white powder. The cash seized from Jones was that provided earlier by Officer Wethern to Officer Polk.

Officer Wethern testified further that Jones was taken to headquarters and advised of her rights; and that, after acknowledging that she understood them, she gave a statement. Jones' counsel objected to the admission of the statement and, outside the presence of the jury, questioned the Officer about the circumstances under which the statement was made. The objection was overruled.

Officer Wethern testified that Jones stated that several of the packets contained "bunk"; that only a few were "good"; that she had obtained a package from "Lionel"; that Lionel was on the scene; and that she could not believe that the officers did not see or arrest him. After Jones made this statement, the officers attempted unsuccessfully to locate Lionel.

On cross-examination, Officer Wethern testified that, when he initially saw Jones, she was coming from the direction of a housing project; that she went directly to Officer Polk's vehicle; and

that, after speaking to another individual, she entered the vehicle. When asked whether she appeared "to be under the influence of possibly liquor or drugs", Officer Wethern responded that, when he was speaking to her, she seemed "fairly lucid and seemed to know what she was doing".

Jones testified in her own defense. She saw Officer Polk in the restaurant parking lot that 4 September, but did *not* speak to him, or enter his vehicle, or sell him heroin. She talked to a "white boy" who was standing outside of a car. Although she had been using heroin and cocaine that night, and had been in a hospital until two weeks earlier for methadone addiction treatment, she recalled everything that happened. An officer searched her, but did not seize any money from her, except for a few dollars and ten days' worth of heroin. She denied having $300.

Jones recalled speaking to the officers at police headquarters; she told them that the 26 bags they took from her contained her antibiotic medication. The medication was packaged the same way as the heroin, because she had trouble swallowing pills. The officers asked her to cooperate; but, when asked whether she knew certain individuals, she did not. On the Tuesday following her arrest on Friday, Officer Wethern and a district attorney visited her in jail and made the same proposal. She was charged originally only with possession of the heroin seized from

her; the distribution charge was not made until after she met with the district attorney and Officer Wethern.

On cross-examination, Jones testified that Officer Polk had lied; that she *never* entered his vehicle, sold him drugs, or received money from him; that she paid for her heroin by working as a seamstress; that she did not sell heroin; and that she remembered everything that happened on 4 September. Jones admitted to prior convictions for possession of heroin in 1970 and for shoplifting. When the prosecutor attempted to elicit testimony regarding a prior conviction for theft, Jones' counsel's objection was sustained.

Officer Overman testified for the State in rebuttal. She arrested Jones at approximately 9:30 p.m. on 4 September, after having observed her entering an unmarked vehicle with an undercover police officer. On searching Jones, Officer Overman found four $100 bills in one of Jones' pants pockets and, in another, 10 aluminum foil packets containing white powder.

In closing argument, Jones' counsel stated:

> I have no witnesses to bring forward on behalf of this woman. She put herself on the witness stand, and you saw her on that stand; you heard her testimony. She testified that she's been a, from her own lips, an addict, shooting up heroin, and anything else she can get her hands on, for about 18 years. She's tried to kick it; she was right back on it. At that time and point in question, September 4, ... she was back on the stuff again....
>
> Now, the officers, I asked Polk, I said, well what was her condition? Did she seem a little high or something? And I think the

other officer, I forget his name, I talked to him; he was the one present when the statement was allegedly made by this woman. He didn't notice anything unusual about her. *Maybe at some points and times, these people handle so many addicts, they don't see the difference between addicts and normal people.*

....

But we got a situation where we've got maybe three or four officers involved in this surveillance in the whole incident, and we get this gal back at police headquarters and read her her rights, and all of a sudden she starts talking, whatever she said, *allegedly said. There's no real record of it, no written statement. If she was so clear in head and mind, no written statement, if she was so cooperative in whatever she was supposed to have stated to the officers.*

[T]hey booked her with ... maybe distribution, which on the facts of the situation is a beautiful case. My God, you couldn't have a better case than this. Three to five officers watching this go down; her with the money, the heroin. Locked, locked. This is a locked case.

*Now, she was busted on September the 4th. She wasn't indicted with this charge until October the 28th.*
....

Now, on that basis, she was arrested, I think she said it was a Saturday. On Tuesday, the following Tuesday, the last officer that testified and someone from the district attorney's office goes back to see her. *And I guess she didn't cooperate with them, 'cause then, bingo. She's not charged with possession; she's charged with sale. But that doesn't come in till after.*

Now, I've got a mountain to get over 'cause I've got three officers who testified

that they saw a transaction go down.  Like a woman who's an addict doesn't know what end is up, realistically.

Now, like I said entering this thing, the state's shooting for a locked case; they're looking for life.  That's up to you to make the determination whether or not you'll go for life.  *There are other responsive verdicts; the judge will go into that aspect.  But when you look at the state's case, and to make a determination that this charge wasn't taken till over a month after she was arrested, there's something there that doesn't ring.*

Now I don't know how they make cases.  I know it's a dirty business.  We all know that; we see it on TV.  We see what these drug dealers do.  We see how a dealer can get an addict and use that addict, *and we've seen situations where cops can make this happen if they want.  Not saying that these officers did, but there's always that possibility.*

Now if this gal is walking around near that project with about 46 bags of junk on her, bunk or otherwise, she's got to be nuttier than a fruitcake or loaded.  She had to be higher than a kite, because when you walk around with that type of candy around those projects, baby, you don't walk; you are laid flat and you are hijacked and you are robbed.

....

I don't know, I don't know.  I wasn't there.  You got to put it all together.... You've got to figure out what happened.  *But when they come back, the district attorney's office comes back, nearly a month later, and writes her with a sale because she's not cooperating, I guess, then you better think about it.*

> *And there are other responsive verdicts;*
> *think about that. The judge will instruct you*
> *on them.*
>
> ....
>
> Now, let's face it, one big point, and
> these boys know when they're out in that
> street, if you got a bunker, he better have a
> fast jet and take off, because whoever makes a
> buy is going to be running at you up and down
> and he's going to ventilate his head.
>
> Now that's it; you don't bunk. This babe
> is an addict. If she knew what she was
> putting down, she's got to be nuts or high on
> that night.

(Emphasis added.)

Although the jury instructions are not in the record, the jury verdict form reflects that the jury could consider five possible verdicts: (1) guilty as charged; (2) *attempted distribution* of heroin; (3) *possession* of heroin; (4) *attempted possession* of heroin; and (5) not guilty.

After deliberating only eight minutes, the jury unanimously found Jones guilty, as charged, for distribution of heroin. The trial court imposed a mandatory sentence of life imprisonment, at hard labor, without benefit *of parole*, probation or suspension of sentence.

Jones appealed to the Louisiana Fourth Circuit Court of Appeal. In the brief filed by a new court-appointed counsel, also with the Orleans Indigent Defender Program, Jones contended that, by denying the right to parole, the trial court imposed an

unconstitutionally excessive sentence. Apparently, Jones also filed two *pro se* briefs. Although they are not in the record, the state appellate court's opinion reflects that she asserted that her trial counsel was ineffective in failing to (1) prepare a trial strategy, (2) investigate the case, (3) confer with her prior to trial, (4) advise her, prior to her testimony, of her Fifth Amendment right against self-incrimination; and in making (5) improper remarks during closing arguments.

In August 1991, while her direct appeal was pending, Jones filed for post-conviction relief in the state trial court, presenting the following claims: (1) her Fourth Amendment rights were violated when she was searched by a male officer, when a female officer was in the vicinity; (2) her conviction was based on insufficient and/or illegally produced evidence, and was the result of entrapment, because the evidence allegedly seized from her was planted on her; and (3) her rights under the confrontation clause were violated, because the confidential informant was not present at trial for cross-examination. Because Jones' direct appeal was pending, the trial court refused to entertain the application.

The Louisiana court of appeal ruled in March 1990 that Jones' sentence was illegal, because the statutory penalty for heroin distribution does *not* prohibit parole. **State v. Jones**, 559 So. 2d 892 (La. Ct. App. 4th Cir. 1990). Accordingly, it removed the parole-prohibition from Jones' sentence.

The appellate court stated that the record was inadequate to address four of the five ineffective assistance of counsel claims presented in Jones' *pro se* briefs (preparing, conferring, investigating, and advising). *Id*. at 893. It stated that Jones' remedy on those claims was "through an application for post conviction relief in the trial court, where the effectiveness of defendant's counsel can be fully developed in an evidentiary hearing". *Id*. at 894.

On the other hand, the court *did address* Jones' fifth ineffective assistance claim: improper, prejudicial remarks during closing argument. As stated, Jones' *pro se* briefs are not in the record. However, the appellate court's opinion states that Jones complained specifically of the following closing argument statements:

> Now, I've got a mountain to get over, 'cause I've got three officers who testified that they saw a transaction go down. Like a woman who's an addict doesn't know what end is up, realistically.

*State v. Jones*, 559 So. 2d at 894.

The appellate court held:

> Our review of the closing argument in its entirety and the testimony adduced at trial shows that *counsel was not deficient* in making the statements complained of and *defendant was not prejudiced* by counsel's remarks. As revealed by the trial transcript, three officers testified for the State that they took part in the surveillance and witnessed defendant's participation in the exchange. They testified that the same $300 given to

> defendant by Officer Polk was retrieved from defendant's person after the exchange. This testimony was rebutted only by defendant's own self-serving testimony that she did not get into Polk's car, did not sell him anything, and did not receive any money from him. Additionally, defendant testified that she was treated for a methadone addiction just prior to the offense ... [and] that she was "shooting" heroin and cocaine on the night of the offense.
>
> In his closing argument, defense counsel merely acknowledged the unfavorable testimony which was already before the jury. *He then appealed to the jury to consider returning one of the responsive verdicts, due to defendant's addiction and consequent state of mind.*

*Id.* (emphasis added).

In early 1992, Jones moved to correct her sentence, asserting that, although the parole-prohibition had been removed, the parole board had informed her that she was not eligible for parole consideration until her life sentence had been commuted to a fixed number of years. For the same reason, the trial court denied Jones' motion that April, citing LA. REV. STAT. 15:574.4B, which provides, in pertinent part: "No prisoner serving a life sentence shall be eligible for parole consideration until his life sentence has been commuted to a fixed term of years". (At oral argument in our court, Jones' counsel confirmed this requirement.)

Approximately five months later, in September 1992, Jones filed for post-conviction relief in state court, claiming ineffective assistance at trial and on direct appeal. Appellate counsel was cited for failing to order a complete trial transcript.

Trial counsel was charged with making an erroneous tactical decision in having her testify, against her will; and with failing to advise that she had a right not to do so. The record does not contain a ruling or other disposition of this application; nor is there any indication that Jones made an effort to obtain a ruling from the trial court or any other state court.

In mid-1996, Jones, proceeding *pro se*, filed for federal habeas relief, claiming that her conviction was the result of counsel's failure to (1) prepare a trial strategy; (2) investigate her case; (3) confer with her prior to trial; (4) advise of her right against self-incrimination; and (5) present an entrapment defense.

The magistrate judge recommended that an evidentiary hearing was not necessary and that relief be denied. He noted that Jones had not exhausted her state remedies, but concluded that they were technically exhausted, as discussed *infra*. Doubting the applicability of the Antiterrorism and Effective Death Penalty Act (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (1996), enacted a few months before Jones sought federal relief, the magistrate judge addressed the merits of Jones' claims, using pre-AEDPA standards and noting that she "may demonstrate either cause or prejudice for the default or that a fundamental miscarriage of justice will result from a failure to analyze her claims".

Regarding the claim that counsel failed to prepare a strategy that focused on lack of predisposition to distribute heroin, the magistrate judge stated that Jones' contention was unsupported by any showing of evidence that counsel could have, but did not, present at trial; and that Jones had not even alleged that she had suggested such a defense to counsel. In this regard, the magistrate judge rejected Jones' claim that her counsel was ineffective for failing to present an entrapment defense, because Jones had not produced any facts supporting how the defense might have changed the outcome of her case.

With respect to claims that counsel failed to investigate the surveillance, the photocopying of the money used to pay for the heroin, and the arrest warrant, the magistrate judge stated that Jones had failed to allege what type of evidence would have resulted from such an investigation.

As for the contention that counsel was ineffective for failing to confer, resulting in her inability to request the presence of the confidential informant to testify in her behalf, the magistrate judge stated that Jones had not shown prejudice based on her "conclusory allegation", because she had not explained how such testimony would have strengthened her defense.

Finally, with respect to Jones' claim that counsel should have advised of her right not to testify, the magistrate judge stated that Jones had failed to show that, had the evidence concerning her addiction not been heard, the result would have been different;

that, in the light of the overwhelming evidence of Jones' guilt, any reference to her addiction did not contribute to her conviction.

In her *pro se* objections to the magistrate judge's recommendation, Jones did *not object* to the recommendation regarding her claim that counsel was ineffective in failing to advise of her right not to testify. She did assert: at the time of trial, she suggested to counsel the defense of lack of predisposition to distribute heroin; had he investigated the surveillance, the money-photocopying, and the warrant, he would have established that someone other than Jones was supposed to deliver the heroin; had he conferred with her before trial, she would have requested the presence of the confidential informant to testify in her behalf that the deal was made with someone other than Jones to deliver the heroin, which would have strengthened her entrapment defense; and he was ineffective in failing to present that defense. Concerning entrapment, she maintained: had such a defense been presented, counsel would have established that she was brought to the restaurant parking lot; she was told to approach and enter the officer's vehicle and tell him she could only sell him one bundle at that time; and someone else was supposed to deliver two bundles of heroin for $750.

After the district court appointed counsel (federal public defender) to represent Jones, it held an evidentiary hearing.

Jones testified: she never had the opportunity to meet with counsel in private before trial, but had met with him only while in the courtroom; she never talked to any investigators from his office; he never visited her at the jail; she did not discuss her testimony with him before testifying and did not know what questions he would ask her; he did not tell her that she had a right not to testify; and he never discussed with her the possibility of a plea bargain.

On cross-examination, when asked (1) whether there was anything that she thought should have happened in the trial that did not, Jones testified that "my lawyer could have talked to me concerning my case so that he could get familiar with my side", and that, when she tried to talk to him in the courtroom, "he wouldn't listen"; (2) whether she provided counsel with the names of any witnesses, she replied that she "told him about the man that wanted to give the police officer his name and he told me that they didn't get the name, so that's dead"; and (3) what defense she would present at a new trial, Jones testified that she "would have asked them where was the confidential informant". According to Jones, the informant could have testified that Lionel, not she, was guilty, because "Lionel was the one with the dope". Nevertheless, directly contradicting her trial testimony, she *admitted* that she entered Officer Polk's vehicle and sold "it" to him.

Jones testified that she lied at trial because the officers had lied. Then, contradicting her earlier admission that she had sold heroin to Officer Polk, Jones testified that she "did not sell the officer anything in the car". She maintained: she entered his vehicle because the confidential informant was standing beside it and told her that the person in the vehicle was his friend; when the officer said he had the money and asked for the "dope", the confidential informant told her, "Jean, he just wants the stuff, that's all"; she replied that she did not have it; Lionel, who was inside the restaurant, had it; after she obtained the heroin from Lionel, she gave it to the confidential informant, who gave it back to her, and then she gave it to the officer; no money was seized from her; and, instead, "they got the money off the ground somewhere".

On redirect, Jones testified that her counsel did not discuss with her the level of her drug usage or how it might affect the way she could recall what happened on the day of the incident. Regarding how she became involved in the transaction, Jones testified: on the day of her arrest, she was standing on the corner when the confidential informant, whom she described as a "white boy", pulled up in his truck and beckoned for her; he asked if she could get him two bundles of heroin for his friends, who were about to leave town and needed some heroin to tide them over until they reached their destination; she replied she did not have

- 18 -

anything and did not know anyone who did, but would look around; and she asked several people, but no one had two bundles of heroin.

She testified further: the confidential informant telephoned her later; he knew her name because "he comes around there all the time buying dope off that corner"; he again inquired about her getting two bundles, and she stated she had not yet found any; she then located Lionel, who agreed to sell two bundles; she did not know Lionel; someone else had told her he had some drugs; and it was the first time she had met him.

Continuing, Jones testified: when the confidential informant called her back, she told him she had located someone who would sell him two bundles; the informant told her to bring the dealer with her to the fast-food restaurant at a certain time; and she went to the pre-arranged location with Lionel, who had the heroin.

When questioned by the district court, Jones testified: the confidential informant promised her $100 and ten bags of heroin if she would obtain two bundles of heroin for him; and she became involved with the deal in order to obtain money and drugs for herself.

The State called Jones' trial lawyer as a witness at the evidentiary hearing. (Counsel testified that he had not reviewed the file or his notes, because he had "no idea" where the file clerks had put them.) He testified: he talked to Jones about her defense; she told him she was an addict; he determined her defense strategy would be that, because she was an addict, she thought she

was selling "bunk" rather than heroin, and engaged in such conduct only to make a little money to support her addiction; Jones did not give him the names of any witnesses, and did not tell him she had recently been in a drug treatment program; and he did not recall any discussions concerning a confidential informant.

When asked by the district court whether he had considered an entrapment defense, counsel replied:

> The entrapment aspect, I don't know, ... *based on what transpired at the motion hearing, and also what transpired during the trial*, ... I believe she came forward on her own, made the contact, left, came back and got in the vehicle, and she was arrested ... it was a prearranged situation.

(Emphasis added.)

Counsel testified further: he discussed the case with Jones three or four times, including whether she wanted to testify; the discussions took place in the courtroom; he did not visit Jones in jail, because he had difficulty getting in and out of it; and the district attorney's office was *not interested* in a plea bargain, because they had a good case. When asked whether he sought any assistance from investigators, he testified that he did not need such assistance; that, because Jones was arrested at the scene in the presence of at least three officers, there was nothing to investigate.

In her post-hearing memorandum, Jones asserted that counsel (1) never acted upon his speedy trial motion by filing a motion to

quash the indictment; (2) never attempted to build a rapport with her, or visited her in jail, or spoke to her about her case; (3) did not tell her she had a right not to testify; (4) should have pursued his request for identity of the confidential informant, so that he could present a coherent entrapment defense; (5) should have subpoenaed the confidential informant, which could have caused the State to offer a reduced charge in exchange for a plea; and (6) should have investigated her medical, substance abuse, family, and social history. Jones also pointed out that, in three published opinions, counsel had been found incompetent.

The district court found Jones' testimony more credible than counsel's with respect to their versions of their discussions about the case. *Jones v. Jones*, 988 F. Supp. 1000, 1006 & n.11 (E.D. La. 1997). Concerning counsel's performance, the court stated:

> [I]nstead of exploring what possible defenses existed, trial counsel appeared to have abandoned the case early on. At trial, he presented a lackluster and to some extent incoherent theory of defense which he had not adequately investigated and which was contradicted by the evidence he had to know existed. He failed to meaningfully consult with his client, called her to testify without any preparation, and then in closing argument gave the case away to the prosecution. The defense appeared to be that Jones was high on drugs and thought what she was distributing was bunk, not heroin. Assuming this could have been a valid legal defense, it was so poorly investigated and presented as to be no defense at all.

*Id*. at 1003. As covered *infra*, the court discussed, in considerable detail, numerous instances of deficient performance, including waiving opening statement, and failing to argue for lesser included offenses and to emphasize the mandatory life sentence. *Id*. at 1003-08.

The court concluded that trial counsel's representation was so inadequate that it entirely failed to subject the prosecution's case to meaningful adversarial testing; and therefore, pursuant to *United States v. Cronic*, 466 U.S. 648 (1984), constituted a denial of Jones' Sixth Amendment rights, without the necessity of showing prejudice. 988 F. Supp. at 1003. Alternatively, the court held that, pursuant to *Strickland v. Washington*, 466 U.S. 668 (1984), Jones had demonstrated prejudice because of counsel's deficient performance. *Jones*, 988 F. Supp. at 1003.

Accordingly, the district court ordered Jones to be retried within 120 days or the charge would be dismissed. *Id*. at 1010. After the district court denied a stay pending appeal, our court granted the stay and expedited review.

## II.

Before reaching the merits, Jones' failure to obtain a state court ruling on her habeas claims (exhaust her state remedies) must be addressed.

### A.

"To have exhausted his state remedies, a habeas petitioner must have fairly presented the substance of his claim to the state courts." *Nobles v. Johnson*, 127 F.3d 409, 420 (5th Cir. 1997), *cert. denied*, ___ U.S. ___, 118 S. Ct. 1845 (1998). This serves "to protect the state courts' role in the enforcement of federal law and prevent disruption of state judicial proceedings". *Rose v. Lundy*, 455 U.S. 509, 518 (1982).

> Under our federal system, the federal and state courts are equally bound to guard and protect rights secured by the Constitution. Because it would be unseemly in our dual system of government for a federal district court to upset a state court conviction without an opportunity to the state courts to correct a constitutional violation, federal courts apply the doctrine of comity, which teaches that one court should defer action on causes properly within its jurisdiction until the courts of another sovereignty with concurrent powers, and already cognizant of the litigation, have had an opportunity to pass upon the matter.

*Id.* (brackets, internal quotation marks, and citations omitted).

Although claims are considered to be "technically" exhausted when state relief is no longer available, without regard to whether the claims were actually exhausted by presentation to the state courts, *Coleman v. Thompson*, 501 U.S. 722, 731-33 (1991), if a petitioner "fails to exhaust available state remedies and 'the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would find the claims procedurally barred'", then the claim is procedurally

defaulted.  *Nobles*, 127 F.3d at 420 (quoting *Coleman*, 501 U.S. at 735 n.1).   In other words, when federal habeas claims "are 'technically' exhausted because, and only because, [petitioner] allowed his state law remedies to lapse without presenting his claims to the state courts ...[,] there is no substantial difference between nonexhaustion and procedural default." *Magouirk v. Phillips*, 144 F.3d 348, 358 (5th Cir. 1998).   Federal habeas relief may be granted on a procedurally defaulted claim only if the petitioner "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law or demonstrate that failure to consider the claim[] will result in a fundamental miscarriage of justice".  *Moawad v. Anderson*, 143 F.3d 942, 947 (5th Cir.) (pre-AEDPA), *cert. denied*, ___ U.S. ___, 119 S. Ct. 383 (1998); *Nobles*, 127 F.3d at 423 n.33 (post-AEDPA); *Williams v. Cain*, 125 F.3d 269, 276 (5th Cir. 1997) (post-AEDPA), *cert. denied*, ___ U.S. ___, 119 S. Ct. 144 (1998); *cf*. *United States v. Flores*, 135 F.3d 1000, 1006 n.23 (5th Cir. 1998) (post-AEDPA, § 2255).

In her *pro se* brief in support of her habeas petition, Jones asserted that she had exhausted her state remedies.  The State responded that the petition should be dismissed without prejudice on the basis of nonexhaustion.  In her *pro se* reply to the State's response, Jones asserted that she had applied for post-conviction relief in September 1992, but that the trial court had not ruled.

She did not dispute the State's assertion that she had neither sought mandamus nor pursued other remedies to obtain a ruling. But, she asserted that no purpose would be served by requiring her to return to state court because, in that the time limitation in which to apply for state relief had expired, she no longer had state remedies available within the meaning of 28 U.S.C. § 2254(b).

Jones has failed to exhaust her state remedies on her ineffective assistance claims. As noted, although she raised five ineffective assistance claims on direct appeal (not preparing, investigating, conferring, or advising of right not to testify; and improper closing argument), the state appellate court ruled that all but the closing argument claim were premature and should be presented in a post-conviction application. (Jones did *not* assert a closing argument claim in her federal habeas petition.)

In her 1992 application for state post-conviction relief, Jones raised two ineffective assistance of *trial counsel* claims, one of which had been raised on direct appeal: (1) calling her as a witness, against her will; and (2) failing to advise of her right not to testify. As stated, the record contains no evidence that the court ever ruled on this application; nor is there any evidence that Jones took any steps to secure a ruling.

Jones presented five ineffective assistance claims in her federal application: (1) not preparing a trial strategy focused on her lack of predisposition to distribute heroin; (2) not

investigating the surveillance, money-photocopying, and arrest warrant; (3) not conferring with her before trial, which prevented her from requesting the presence of the confidential informant to testify in her behalf; (4) not advising of her right not to testify, which resulted in her admitting to being on heroin and cocaine at the time of the arrest and to her methadone addiction; and (5) not presenting an entrapment defense. The prepare, investigate, and confer claims, numbers (1), (2), and (3) above, were presented on direct appeal, but the state appellate court ruled that they were premature and should be presented in a post-conviction application; none of these three claims were presented in a post-conviction application. The advise claim, number (4) above, was presented both on direct appeal and in the 1992 post-conviction relief application; it, too, was not resolved on direct appeal. And, again, the record contains no evidence of a ruling on the 1992 application. The entrapment claim, number (5) above, was presented for the *first time* in Jones' federal application. Accordingly, *none* of the claims are exhausted.

The magistrate judge noted that Jones cannot seek leave to appeal her claim in state court, because she has already made the one appeal to which she is entitled, LA. CODE CRIM. PROC. art. 914; and that state court collateral review of the unexhausted claims is barred, because the time limitation in which to apply has expired.

LA. CODE CRIM. PROC. art. 930.8 (imposing three-year time limit except under certain circumstances not applicable here).

The magistrate judge noted also that our court has held that, if a habeas petitioner has not exhausted state remedies because of a failure to meet a state procedural requirement, federal relief is barred, and suggested that relief could be denied on the basis of procedural default. Nevertheless, as discussed, he addressed the merits of the claims, stating that "petitioner may demonstrate either cause or prejudice for the default or that a fundamental miscarriage of justice will result from a failure to analyze her claims". The magistrate judge did *not* find that Jones had overcome the procedural bar; he apparently addressed the merits based on the assumption that she *might* be able to do so.

The district court did *not* address exhaustion; instead, at the end of the opinion, it states only that failing to grant habeas relief "would result in a fundamental miscarriage of justice". *Jones*, 988 F. Supp. at 1010. *See* *Magouirk,* 144 F.3d at 359 ("Procedural default may be excused upon a showing of cause and prejudice or that application of the doctrine will result in a fundamental miscarriage of justice."). Perhaps this was intended as a ruling that Jones had overcome the procedural bar to federal relief; but the opinion offers no guidance on that point.

In its brief in our court, the State did *not* claim failure to exhaust state remedies and did *not* rely on a procedural bar.

However, at oral argument, it asserted that, pursuant to AEDPA, as discussed *infra*, it did *not* waive the exhaustion requirement.

Prior to the April 1996 enactment of AEDPA, § 2254 contained the following provisions regarding exhaustion of state remedies:

> (b) An application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court *shall not be granted* unless it appears that the applicant has exhausted the remedies available in the courts of the State, or that there is either an absence of available State corrective process or the existence of circumstances rendering such process ineffective to protect the rights of the prisoner.

> (c) An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

(Emphasis added.)

Under pre-AEDPA law, an appellate court may raise, *sua sponte*, the failure to exhaust state remedies. *See **Granberry v. Greer***, 481 U.S. 129, 133-34 (1987) (appellate court may raise *sua sponte* petitioner's failure to exhaust state remedies); ***Graham v. Johnson***, 94 F.3d 958, 970 (5th Cir. 1996) (emphasis omitted) ("a panel of this court, in its discretion may either accept or reject the state's waiver of the exhaustion requirement, or notice sua sponte the lack of exhaustion").

And, under pre-AEDPA law, exhaustion was not required if an attempt to exhaust state remedies would be futile (futility

exception). *See **Duckworth v. Serrano***, 454 U.S. 1, 3 (1981) ("An exception [to the exhaustion requirement] is made only if there is no opportunity to obtain redress in state court or if the corrective process is so clearly deficient as to render futile any effort to obtain relief"); ***Graham***, 94 F.3d at 969 ("exhaustion is not required if it would plainly be futile"). The futility exception appears to be derived from the language of pre-AEDPA § 2254(b) (habeas relief shall not be granted unless it appears that petitioner has exhausted state remedies "or that there is either an absence of available State corrective process or the existence of circumstances rendering such process ineffective to protect the rights of the prisoner").

But, as noted, Jones filed her federal application after the effective date of AEDPA. Accordingly, it applies. *See **Nobles,*** 127 F.3d at 415. AEDPA amended the exhaustion provisions of § 2254. Subsection (b)(1) is substantially identical to pre-AEDPA § 2254(b); it provides:

> (b)(1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court *shall not be granted* unless it appears that—
>
> (A) the applicant has exhausted the remedies available in the courts of the State; or
>
> (B)(I) there is an absence of available State corrective process; or

> > (ii) circumstances exist that
> > render such process ineffective to
> > protect the rights of the applicant.

(Emphasis added.)

AEDPA contains no counterpart to pre-AEDPA § 2254(c) (no exhaustion if applicant has right under state law to raise question presented). But, two new subsections were added by AEDPA to § 2254(b):

> > (2) An application for a writ of habeas corpus *may be denied on the merits*, *notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State*.

> > (3) A State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement *unless the State, through counsel, expressly waives the requirement*.

(Emphasis added.) Both of these new provisions come into play in this case. Although, at first glance, they might appear to be in conflict, they are not, for the reasons that follow.

Our court has not addressed whether the futility exception to exhaustion survived AEDPA's enactment. But, as noted, the language of § 2254(b)(1)(B) is substantially identical to the language of pre-AEDPA § 2254(b), upon which the futility exception appears to be based.

Assuming *arguendo* that this exception applies post-AEDPA, Jones has not shown it applies here. She asserted in her *pro se* reply to the State's answer to her petition that requiring

exhaustion would be futile, because state court relief was no longer available. But, that is "only because[] [s]he allowed h[er] state law remedies to lapse without presenting [them] to the state courts" in a timely application for post-conviction relief. *Magouirk*, 144 F.3d at 358. Under such circumstances, she cannot find shelter under the assumed futility exception. *See Coleman*, 501 U.S. at 732.

As discussed, both before and after AEDPA's enactment, § 2254 provides that habeas relief "*shall not be granted*" unless the applicant has exhausted state remedies, or there is an absence of available state corrective process, or there are circumstances that render such corrective process ineffective to protect the petitioner's rights. 28 U.S.C. § 2254(b)(1), as amended by AEDPA; 28 U.S.C. § 2254(b) (pre-AEDPA). On the other hand, as the magistrate judge noted, AEDPA allows a federal court, in its discretion, to *deny habeas relief* on the merits, regardless of whether the applicant has exhausted state remedies. 28 U.S.C. § 2254(b)(2). *See Nobles*, 127 F.3d at 423 (noting that "AEDPA amended 28 U.S.C. § 2254(b) to allow a federal court to deny an application on the merits" notwithstanding petitioner's failure to exhaust state remedies; and reviewing *de novo* district court's alternative conclusion that unexhausted claim would not have succeeded on merits).

This reading of the new § 2254(b)(2) does not conflict with the earlier-referenced new provision which immediately follows it, § 2254(b)(3), which allows a State to rely on the exhaustion requirement, unless it *expressly waives* that requirement. As noted, although, in its appellate brief, the State did not urge dismissal for failure to exhaust, at oral argument it refused, pursuant to § 2254(b)(3), to waive exhaustion. But, obviously, when a federal court *denies habeas relief* on the merits for an unexhausted claim, concerns for comity are much less compelling than when it *grants relief* on such a claim.

Accordingly, even when, as in this case, exhaustion is not waived, courts have the "discretion in each case [under § 2254(b)(2)] to decide whether the administration of justice would be better served by insisting on exhausting or by reaching the merits of the petition forthwith". *See* **Granberry**, 481 U.S. at 131, 134 (pre-AEDPA). Because, as explained *infra*, we conclude that Jones does not prevail on the merits, we may, pursuant to § 2254(b)(2), deny relief, notwithstanding Jones' failure to exhaust state remedies.

The dissent fails to comment on the fact that *all* of Jones' ineffective assistance claims have not been exhausted in state court. As explained, although AEDPA gives a federal court the discretion to *deny* such claims on the merits, notwithstanding the State's failure to expressly waive exhaustion, it does not

authorize the result reached by the district court and urged by the dissent—*granting* habeas relief on unexhausted claims.

B.

An ineffective assistance claim presents mixed questions of law and fact. *E.g.*, **Nobles**, 127 F.3d at 418. Therefore, the district court's conclusion is reviewed *de novo*, **id**. at 423; but its underlying factual findings, for clear error. *See* **Self v. Collins**, 973 F.2d 1198, 1203 (5th Cir. 1992), *cert. denied*, 507 U.S. 996 (1993).

AEDPA, § 2254(d), provides standards for granting habeas relief *when a claim has been adjudicated on the merits in state court*. Pursuant to § 2254(d)(1), "a federal court will ... not grant a writ of habeas corpus unless the state court's conclusions involved an 'unreasonable application' of clearly established federal law as determined by the Supreme Court". **Nobles**, 127 F.3d at 418. "An application of federal law is unreasonable if it is so clearly incorrect that it would not be debatable among reasonable jurists". **Id**. (internal quotation marks and citation omitted). But, with only one exception (closing argument claim, raised in appellate brief but *not* in federal application, which was adjudicated on merits on state direct appeal), that standard is inapplicable here, because the balance of Jones' ineffective assistance claims have not been adjudicated on the merits in state court.

- 33 -

The Supreme Court's "decisions have emphasized that the Sixth Amendment right to counsel exists 'in order to protect the fundamental right to a *fair trial*'". **Lockhart v. Fretwell**, 506 U.S. 364, 368 (1993) (quoting **Strickland**, 466 U.S. at 684) (emphasis added). Indeed,

> [T]he right to the effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a *fair trial*. Absent some effect of challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated.

**Cronic**, 466 U.S. at 658 (emphasis added).

To prevail on an ineffective assistance claim, the applicant ordinarily must show "that counsel's performance was deficient" and "that the deficient performance prejudiced the defense". **Strickland,** 466 U.S. at 687. On the other hand, "if counsel *entirely fails* to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable". **Cronic**, 466 U.S. at 659 (emphasis added).

As discussed, the district court held that, pursuant to **Cronic**, Jones was not required to demonstrate prejudice; alternatively, that Jones had done so under **Strickland**.

1.

- 34 -

As the earlier, lengthy recitation of the procedural history and proceedings for Jones' trial demonstrates, counsel did not "entirely fail to subject the prosecution's case to meaningful adversarial testing"; far from it.  Among other things, he attempted pre-trial to suppress the evidence and Jones' statement, objected at trial to the admission of that statement, and cross-examined the State's witnesses.  As the district court acknowledged, the evidence against Jones was strong, which necessarily limited the available defenses.  And, as the Court noted in *Cronic*, "the Sixth Amendment does not require that counsel do what is impossible or unethical.  If there is no bona fide defense to the charge, counsel cannot create one and may disserve the interests of his client by attempting a useless charade." *Cronic*, 466 U.S. at 656 n.19.

> Previously faced with a similar question, we drew the line between simple ineffective assistance requiring a showing of prejudice—the more typical case—and presumptive unreliability: bad lawyering, regardless of *how* bad, does not support the presumption; more is required. *See **Woodard v. Collins***, 898 F.2d 1027 (5th Cir. 1990) (suggesting claim of no investigation by attorney would still require showing of actual prejudice). We must remember that we are addressing the case from hindsight, a luxury not available to an attorney developing trial strategies and making judgement calls prior to and at trial. The fact that another lawyer might have developed different strategies or made different calls itself does not necessarily show unfairness....

*McInerney v. Puckett*, 919 F.2d 350, 353 (5th Cir. 1990) (emphasis in original); *see also Jackson v. Johnson*, 150 F.3d 520, 524 (5th Cir. 1998) (constructive denial of counsel under *Cronic* "is a very narrow exception to the *Strickland* prejudice requirement"); *Childress v. Johnson*, 103 F.3d 1221, 1229 (5th Cir. 1997) ("A constructive denial of counsel occurs ... in only a very narrow spectrum of cases where the circumstances leading to counsel's ineffectiveness are so egregious that the defendant was in effect denied any meaningful assistance at all.").

In sum, *Cronic* does not control. Remaining is the alternative conclusion that Jones is entitled to relief under *Strickland*: "counsel's performance was deficient"; *and* "the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687.

2.

a.

To prove deficient performance, the first of the two *Strickland*-prongs, Jones must show that counsel's actions "fell below an objective standard of reasonableness". *Id*. at 688. In this regard, it is well to remember that "[o]ur scrutiny of counsel's performance is highly deferential, and we must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time".

*Pitts v. Anderson*, 122 F.3d 275, 279 (5th Cir. 1997) (brackets, internal quotation marks, and citation omitted).

Jones must overcome this "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance". *Williams*, 125 F.3d at 276 (internal quotation marks and citation omitted). "A conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with *obvious unfairness*". *Green v. Johnson*, 116 F.3d 1115, 1122 (5th Cir. 1997) (internal quotation marks and citation omitted) (emphasis added).

As stated, the five deficient performance claims Jones presented in her federal petition were that counsel failed to (1) prepare a strategy focused on lack of predisposition to distribute heroin; (2) investigate the surveillance, money-photocopying, and warrant; (3) confer prior to trial, which prevented Jones from requesting the presence of the confidential informant to testify in her behalf; (4) advise her, prior to calling her as a witness, of her right to remain silent, which resulted in her admission to being on heroin and cocaine at the time of the arrest and to her methadone addiction; and (5) present an entrapment defense.

Following the district court evidentiary hearing, Jones' post-hearing memorandum claimed six instances of deficient performance: counsel (1) never acted upon the speedy trial motion by moving to

quash the indictment; (2) never attempted to build a rapport with Jones, or visited her in jail, or spoke to her about her case; (3) did not tell her she had a right not to testify; (4) should have pursued the request for identity of the confidential informant, so that he could present a coherent entrapment defense; (5) should have subpoenaed the confidential informant, which could have caused the State to offer a reduced charge in exchange for a plea; and (6) should have investigated Jones' medical, substance abuse, family, and social history.  (In short, as discussed *infra*, three of the six instances were new; only items (2), (3), and (4) were presented in the habeas application.)

And, finally, in her appellate brief, Jones contends that counsel's performance was deficient in the following respects: (1) not pursuing a speedy trial motion by moving to quash the indictment; (2) not visiting Jones in jail; (3) not speaking to her about her case; (4) not telling her she had a right not to testify; (5) not investigating the confidential informant and Jones' medical and substance abuse history, family, and friends; (6) not exercising any peremptory challenges or conducting lengthy voir dire during jury selection; and (7) his closing argument demonstrates his abdication of his role as advocate for his client. (In short, as discussed *infra*, Jones has presented two deficient-performance-bases for the first time on appeal—items (6) and (7).)

The district court found deficient performance in the following respects:

First, pretrial preparation was inadequate. Counsel should have requested assistance from investigators, contacted witnesses to bolster the defense that Jones was an addict, and consulted "meaningfully" with her to prepare her testimony. *Jones*, 988 F. Supp. at 1006.

Second, assistance should have been requested from investigators to support the defense that Jones was an addict, especially considering the mandatory life sentence. *Id*.

Third, in that Jones' trial testimony contradicted not only the State's case, but also the theory of defense, counsel should have consulted with Jones prior to trial. *Id*. This should have included advising Jones of her right not to testify and giving her guidance in deciding whether to do so. *Id*. at 1007. Although counsel testified that he consulted with Jones about such matters, the district court accepted as credible Jones' evidentiary hearing testimony that counsel did not discuss her testimony with her in advance and did not advise her of her right not to testify. *Id*. at 1006-07.

Fourth, an entrapment defense should have been presented. *Id*. at 1007. The following evidence was "readily available" to counsel and would have supported a viable entrapment defense: (1) the sale was solicited by a person acting in cooperation with the police

- 39 -

(the confidential informant); (2) the confidential informant was "untested", in that there had been no prior relationship between the informant and the officers; (3) Jones, who was vulnerable to solicitation because she was a heroin addict with no source of income, testified credibly at the evidentiary hearing that the informant instigated the transaction by persuading Jones to obtain two bundles of heroin, and induced her participation by promising her $100 and ten bags of heroin; (4) Jones had no criminal history of drug distribution; and (5) the offense involved only one sale. *Id*. at 1007-08. Counsel did not make a strategic decision to forego an entrapment defense, which would have been entitled to deference. Instead, he failed to make the effort to investigate the viability of such a defense. *Id*. at 1008.

Fifth, counsel committed "a serious error" by abandoning his effort to obtain disclosure of the confidential informant's identity. *Id*.

Sixth, counsel should not have waived opening statement. Because counsel was fully aware, from the pretrial proceedings, of the specifics and strength of the State's case, there was no justifiable strategic reason for waiver. *Id*. at 1003 & n.4.

Seventh, counsel undermined his theory of defense by asking Officer Wethern whether, at the time of her arrest, Jones appeared to be under the influence of drugs. Because the Officer had testified at the suppression hearing, counsel should have known the

answer would be "no".  *Id*. at 1004.  Along this line, the court also criticized counsel's cross-examination of Officer Polk about whether Jones appeared to be under such influence at the time of the sale.  *Id*. at 1004 & n.5.  The court noted that Officer Polk did not testify at the pretrial hearings but, regardless of whether counsel asked the officers who did so testify about Jones' state of mind, counsel was remiss. *Id*. at 1004 n.5.

Eighth, counsel "surrendered the case" in closing argument. *Id*. at 1004.

Ninth, and finally, the closing argument was also deficient because counsel failed both to argue adequately that the jury should return a verdict on a lesser included offense, and to emphasize the mandatory life sentence for a conviction as charged. *Id*. at 1005.

b.

To prove the other *Strickland*-prong, prejudice, Jones must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different". *Strickland*, 466 U.S. at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceeding.  *Id*.

In the light of the deficient performance conclusions, the district court concluded that Jones had demonstrated *Strickland* prejudice in three respects: instead of the mandatory life

- 41 -

sentence, she would have (1) been acquitted by, or (2) received a lesser sentence from, the jury; or (3) the State would have offered a lesser sentence through a plea bargain.  Specifically, the court reasoned that,

> with a proper defense, J[ones] *could* have presented evidence of entrapment by the confidential informant which *could* have provided exculpation despite the proof of all the elements of the offense....  Her longtime heroin addiction, her lack of a criminal record with respect to heroin distribution, the pressures by the "untested" informant and her succumbing to his entreaties in exchange for drugs and money, the difficulty she had in locating a source until "Lionel" appeared, *could* have established to the jury that she was *not a sophisticated dangerous dope dealer needing life imprisonment*, but rather was a heroin addict susceptible to easy manipulation with simple suggestion, much less coercion.
>
> *Even if the entrapment defense did not persuade the jury to acquit*, the evidence presented would have had a "reasonable probability" of bringing in a lesser verdict than the verdict mandating life imprisonment. With a proper presentation through closing argument, the jury would have been fully informed that it was proper to consider the severity of the penalty in deciding whether J[ones] should be convicted as charged. *It is difficult to imagine that a jury would unanimously order a life sentence in a factual circumstance such as this, had it been properly presented.*
>
> Finally, a spirited investigation by counsel and persistence in purs[u]ing the entrapment defense, *may well have resulted in a plea bargain offer from the prosecution to a lesser charge.  Had the case been effectively defended, it is difficult to imagine the*

- 42 -

> *prosecution pursuing a life sentence on this*
> *petition with any enthusiasm....*

*Id*. at 1009 (emphasis added).

As noted, several instances of deficient performance claimed in Jones' post-hearing memorandum and appellate brief were not raised in her habeas petition (failure to fully act on speedy trial motion; investigate history; conduct thorough voir dire; and exercise peremptory challenges). And, several instances of deficient performance relied on by the district court were never raised by Jones in her application or in her post-hearing memorandum. For example, she did not urge ineffective assistance through waiving opening statement; or cross-examining the officers about Jones' state of mind; or making improper remarks and failing to stress certain points in closing argument.

With respect to closing argument, the district court failed to address the state court's conclusion, discussed *supra*, that the performance was not deficient, and that, in the light of the overwhelming evidence against her, Jones was not prejudiced by his remarks. *Jones*, 559 So. 2d at 894. Moreover, the district court failed to apply AEDPA's earlier-referenced deferential standard of review to that conclusion.

In this regard, a federal court may not grant habeas relief on a claim rejected on the merits by a state court, unless that court's adjudication of the claim

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The second clause of § 2254(d)(1) (unreasonable application) applies to challenged state court applications of law to fact. *See Williams*, 125 F.3d at 277. Such application is unreasonable "only when it can be said that reasonable jurists considering the question would be of one view that the state court ruling was incorrect". *Id*.

As quoted *supra*, the state appellate court applied *Strickland* in resolving Jones' closing argument claim. *Jones*, 559 So. 2d at 893. Again, it concluded that counsel's performance was not deficient, because he "merely acknowledged the unfavorable testimony which was already before the jury" and "then appealed to the jury to consider returning one of the responsive verdicts, due to defendant's addiction and consequent state of mind", *id*. at 894; and, that Jones was not prejudiced by the remarks, because the evidence of her guilt was overwhelming. *Id*.

Reasonable jurists considering this issue would not be of one view that the state court was incorrect. Accordingly, Jones was not entitled to federal habeas relief on the ground that counsel

rendered ineffective assistance by making improper remarks during closing argument.

With respect to the conclusion that counsel's performance was deficient for failure to adequately argue that the jury should return a verdict on a lesser included offense, and to emphasize the mandatory life sentence, we note that counsel touched on both subjects during closing argument:

> Now, like I said entering this thing, the state's shooting for a locked case; *they're looking for life. That's up to you* to make the determination whether or not you'll go for life. *There are other responsive verdicts; the judge will go into that aspect.* But when you look at the state's case, and to make a determination that this charge wasn't taken till over a month after she was arrested, there's something there that doesn't ring.
>
> ....
>
> *And there are other responsive verdicts; think about that. The judge will instruct you on them.*

As noted, although the jury instructions are not in the record, the jury verdict form lists five responsive verdicts: (1) guilty as charged; (2) attempted distribution of heroin; (3) possession of heroin; (4) attempted possession of heroin; and (5) not guilty.

No authority need be cited for the rule that issues raised for the first time on appeal are reviewed only for plain error. But, even if, under a very liberal reading, we utilize instead the more lenient, normal standard of review for all of the claimed instances of deficient performance; and, even if we assume that counsel's

performance was deficient in all of the respects urged by Jones and/or found, *sua sponte*, by the district court, we still cannot agree that there is a reasonable probability that the outcome of Jones' trial would have been different had counsel's performance not been deficient in those many respects.

First, the evidence of Jones' guilt on the distribution of heroin charge was overwhelming, to say the least. Three officers testified that they witnessed Jones' participation in the distribution of heroin. She was arrested at the scene, immediately after selling the heroin to an undercover officer. The currency given to Jones by the undercover officer for the heroin was seized from Jones when she was arrested. Jones has not demonstrated that any amount of preparation or investigation would have been reasonably likely to blunt the impact of that evidence. Again, as *Cronic* reminds: "[T]he Sixth Amendment does not require that counsel do what is impossible or unethical. If there is no bona fide defense to the charge, counsel cannot create one and may disserve the interests of his client by attempting a useless charade." *Cronic*, 466 U.S. at 656 n.19. As stated in *Green v. Lynaugh*, 868 F.2d 176, 177 (5th Cir.), *cert. denied*, 493 U.S. 831 (1989): "If the facts adduced at trial point so overwhelmingly to the defendant's guilt that even the most competent attorney would be unlikely to have obtained an acquittal, then the defendant's ineffective assistance claim must fail".

Second, entrapment was not a viable defense. Under Louisiana law, "an entrapment is perpetrated when a law enforcement official or a person acting in cooperation with such an official, for the purpose of obtaining evidence of the commission of an offense, solicits, encourages, or otherwise induces another person to engage in conduct constituting such offense *when he is not then otherwise disposed to do so*." **State v. Batiste**, 363 So. 2d 639, 641 (La. 1978) (emphasis added). The Louisiana Supreme Court noted that its law is consistent with federal law. **Id**. "In entrapment cases, a line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal." **State v. Brand**, 520 So. 2d 114, 117 (La. 1988) (citing **Sherman v. United States**, 356 U.S. 369 (1958)). "For entrapment to exist, a defendant must be induced in some way to engage in criminal conduct which he is not otherwise disposed to engage in; an entrapment defense will not lie if the officers or agents have merely furnished a defendant, who is predisposed to commit the crime, the opportunities to do so." **State v. Bernard**, 441 So. 2d 817, 820 (La. Ct. App. 3d Cir. 1983), *writ denied*, 445 So. 2d 439 (La. 1984). *See also* **State v. Wysinger**, 479 So. 2d 673, 675 (La. Ct. App. 3d Cir. 1985) ("Entrapment exists when the officer instigates the crime: that is, the officer must plan and conceive the crime and the defendant must have perpetrated it only because of the trickery, persuasion, or fraud of the officer.").

The defendant has the burden of proving that she was induced to engage in criminal conduct by a preponderance of the evidence. *State v. Brand*, 520 So. 2d at 117. If the defendant satisfies that burden, the State has the burden of proving beyond a reasonable doubt that the defendant was predisposed to commit the crime. *State v. Kerrigan*, 671 So. 2d 1242, 1245 (La. Ct. App. 2d Cir. 1996).

Jones' trial testimony certainly did *not* support an entrapment defense; she *denied* entering Officer Polk's vehicle and selling him drugs. Obviously, an entrapment defense cannot succeed *when the defendant denies any involvement in the act she allegedly was entrapped into committing*. See **Strickland**, 466 U.S. at 691 ("the reasonableness of counsel's actions may be determined or substantially influenced by the [accused's] own statements or actions").

But, assuming that counsel could have discovered from Jones the vastly different version of events to which she testified at the district court evidentiary hearing, that version likewise does not support entrapment. At that hearing, Jones admitted that she sold heroin to Officer Polk to get money and heroin for herself. She *never claimed* that she would not have become involved in the transaction but for the informant's inducement.

In the light of Jones' addiction, her lack of a legitimate source of income, and her prior convictions, including for

possession of heroin, there is no reasonable probability that the jury would have believed that Jones was not predisposed to distribute heroin in exchange for cash and/or heroin to support her habit. *See* **State v. Prudhomme**, 532 So. 2d 234, 240 (La. Ct. App. 3d Cir. 1988) (defendant's "long history as a drug user, and the fact that defendant made a drug commission on the sale, lends support to the conclusion that [distribution of cocaine] is a crime that the defendant was predisposed to commit"), *writ denied*, 541 So. 2d 871 (La. 1989); **State v. Antoine**, 539 So. 2d 771, 773 (La. Ct. App. 3d Cir. 1989) (prosecution proved predisposition where, although undercover narcotics agent "took advantage of his friendship with defendant, and the officers planned and conceived the crime, defendant readily participated in it upon discovering that he would be paid for each drug transaction he arranged"); **State v. Chatman**, 599 So. 2d 335, 348 (La. Ct. App. 1st Cir. 1992) (defendant's admission that he asked for and received marijuana from confidential informant as compensation for delivering cocaine to confidential informant and undercover agent, and defendant's "admission that he smoked marijuana and had purchased marijuana numerous times were indicative of his predisposition to commit the ... offense [of attempted distribution of cocaine]").

Again, there is not a reasonable probability that entrapment was a viable defense for Jones. Accordingly, contrary to the district court's conclusions, there is not a reasonable probability

that pursuing the defense would have resulted either in an acquittal; or guilt on a lesser charge; or a plea agreement.

As support for her counsel being ineffective under either *Cronic* or *Strickland*, Jones contends that the trial judge was aware that counsel was providing ineffective assistance, but was more concerned with maintaining a low case load than providing indigent defendants with an able attorney. First, even assuming this charge enters into the mix for ineffective assistance claims, Jones did not make this claim in her federal application, but raised it for the first time in her post-hearing memorandum. Second, there is no evidence in the record to support the contention that the trial judge was aware that counsel was providing ineffective assistance to Jones, or that the judge rushed the trial. Jones claims in her appellate brief that "the state appellate court put the trial judge on notice that [her] trial counsel was ineffective"; but, at oral argument, her counsel acknowledged the error in this assertion. The referenced opinions were rendered *after* Jones' trial.

Likewise, we give no weight to Jones' contention that we should conclude that counsel rendered ineffective assistance because, "[o]n other occasions in the same period of time as [Jones'] trial, trial counsel was found to have provided ineffective assistance of counsel to other indigent defendants before the same trial judge". Obviously, each case of claimed

ineffective assistance must turn on its own facts and circumstances.

In short, these trial-judge-interested-only-in-low-docket and counsel-ineffective-at-other-trials assertions are wide of the mark. While some might feel they show admirable zeal in representing a client, others might find them doing more harm than good in seeking to show ineffective assistance of counsel. Along this line, perhaps the most egregious comment by Jones' habeas counsel is his characterization of the following response by Jones' trial counsel at the district court evidentiary hearing:

> [**Jones' habeas counsel**]: But you did know that she had a prior conviction for possession of heroin, didn't you?

> [**Jones' trial counsel**]: Many of them in the city have that conviction.

Jones' habeas counsel states: "Trial counsel's utter contempt for his client, apparent throughout, is most evident in this *unmitigatedly racist remark*". (Emphasis added.) Is the remark racist? Perhaps; perhaps not. Perhaps one had to be there to form a judgment. Perhaps, being of this view, Jones' habeas counsel should have pursued the matter when the statement was made; he didn't. When presented in a brief in this fashion, it merely hinders, rather than helps, in determining whether Jones was deprived of effective assistance of counsel.

The charge against Jones carried a most severe penalty—a mandatory life sentence. But, the sentence *qua* sentence is not at

issue.  Nevertheless, for such a sentence, this was a short trial.
Other defense counsel might, or should, have handled this case
differently.  This is a classic example of ineffective assistance
claims needing to be resolved first in state courts, which have far
greater familiarity with the procedural possibilities, such as
lesser sentences.

Some fair-minded persons, reading this record, might conclude
that Jones' trial counsel did about as well as a lawyer, faced with
these facts, could do.  Others might find his performance
deplorable.  (The dissent certainly does.)  But, this is not our
task.  We review, neither to praise nor to condemn, but to
determine, guided by binding precedent, whether Jones received
ineffective assistance of counsel.

Much of that precedent, especially *Strickland*, speaks directly
to this case, to the bases for prejudice advanced, especially by
the district court.  In the final analysis, those bases boil down
to speculation and the idea that, if only a vigorous defense had
been presented, no fair-minded jury would have translated a sale of
heroin, on these facts, into a life sentence.  Simply put, this is
jury nullification.  But, as *Strickland* instructs, this cannot be
a basis for the requisite deficient-performance-caused-prejudice
prong:

> An assessment of the likelihood of a result
> more favorable to the defendant must exclude
> the possibility of arbitrariness, whimsy,
> caprice, "*nullification*," and the like.  A

defendant has no entitlement to the luck of a lawless decisionmaker, even if a lawless decision cannot be reviewed. The assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision. It should not depend on the idiosyncracies of the particular decisionmaker, such as unusual propensities toward harshness or leniency. Although these factors may actually have entered into counsel's selection of strategies and, to that limited extent, may thus affect the performance inquiry, *they are irrelevant to the prejudice inquiry*.

*Strickland*, 466 U.S. at 695 (emphasis added).

Characterizing the performance by Jones' trial counsel as "one of the more shameful pictures of legal representation that [he has] reviewed as a judge", the dissent concludes that Jones received such ineffective assistance that it equates to a "travesty", and fears that, in denying habeas relief, we have "lost sight of the forest for the trees". The sincerity of that view is not to be doubted. But, notwithstanding how heartfelt the dissent, and as reflected in the foregoing detailed statement of facts and procedural history, the dissent's view of what constitutes prejudice in this case is bottomed on speculation, is contrary to *Strickland*, and seems to be influenced by disagreement with the State of Louisiana's exercise of its prerogative to impose a mandatory life sentence for persons convicted for what the State obviously considers to be the very serious crime of distribution of heroin. (As stated, the sentence *qua* sentence is not at issue; for

- 53 -

example, Jones does not claim that it is unconstitutionally disproportionate.)

The dissent faults Jones' trial counsel for never having a serious conference with Jones, abdicating his responsibility to conduct an investigation into the facts surrounding her arrest, failing to request assistance from investigators, and failing to structure a coherent theory of defense.  But, the dissent fails to square such shortcomings with the prejudice required by *Strickland*. The dissent posits that there is a reasonable probability that the outcome of the proceeding would have been affected, in that Jones might have obtained a plea bargain or lesser conviction.  But, as shown, there is no basis in the record for suggesting that the State would have considered a plea bargain; again, we cannot indulge in speculation.  And, again, when ruling on the prejudice prong, we cannot factor in jury sympathy, which is the only possible basis for a lesser verdict.

Returning to the dissent's metaphor, a forest is made up of its trees; each must be considered in determining the impact of the whole.  As the dissent acknowledges, we have painstakingly examined each tree—each item of deficient performance.  But, in so doing, we have remained focused on the forest—prejudice.  At the completion of our task, we concluded that habeas relief cannot be granted.  We remain of that view.

The requisite prejudice was not shown.  Jones is not entitled to federal habeas relief.

III.

For the foregoing reasons, the judgment granting conditional habeas relief is **REVERSED**; such relief is **DENIED**.

*REVERSED and RENDERED*

*E. GRADY JOLLY, Circuit Judge, dissenting:*

*I respectfully dissent from the majority's conclusion that counsel's representation of the petitioner in this case did not constitute <u>Strickland</u> error.  In my view, the merit of this habeas claim is told by the undisputed facts that a petty dope dealer and drug addict stood trial for a relatively smalltime drug-related crime[1] that, as charged, carried with it a mandatory life sentence. Yet counsel made no effort to work out a compromised plea agreement, and counsel hardly lifted a finger in her defense at trial.*

*In my view, this case presents one of the more shameful pictures of legal representation that I have reviewed as a judge. Notwithstanding that his client was charged with the crime that, if convicted, would send her automatically to the penitentiary with a*

---

[1]All drug-related crimes are serious crimes.  We see everyday, however, crimes more egregious than the present case involving monumental amounts of drugs where the defendants are exposed to far less penalties than the petitioner was here.

*life sentence, counsel never had a serious conference with Jones to discuss her trial testimony nor other trial issues. He abdicated his responsibility to conduct any sort of investigation into the facts surrounding her arrest, including obtaining any information on the confidential informant. Counsel did not request any assistance from the investigators at the Indigent Defender Board. He wholly failed to structure any sort of coherent theory of defense. Although defending the case was made extraordinarily difficult by the solid case that the state had against Jones, a minimum amount of thought and energy would have at least presented a more intelligible and appealing defense for the petitioner than the totally botched case that the jury heard. Moreover, Jones's attorney basically handed her head to the prosecutor on a silver platter, when he allowed her to testify without having (1) advised her of her right not to do so; (2) advised her as to whether, in his legal opinion, she should do so; and (3) discussed with her how her testimony would impact her defense. Under these circumstances, Jones's testimony was so disastrous that there is little wonder that the jury reached the verdict it did.*

*It seems to me that, under the facts found by the conscientious district judge in her extensive opinion, Jones v.*

*Jones*, 988 F. Supp. 1000 (E.D. La. 1997), it is impossible objectively not to conclude that there is a reasonable probability that the outcome of this proceeding would have been different--whether by a plea bargain or a lesser conviction. This reasonable probability of a different outcome is virtually dictated by the inability of the trial court initially to seat a jury for the trial of *this* case, for the reason that the first venire of jurors (39 out of 45) were "unwilling to impose the consequences of a guilty as charged verdict." After the failure to seat a jury occurred, the time surely was propitious for a successful plea agreement, especially in view of the relatively smalltime drug offense and the fact that Jones had no prior arrests nor convictions for heroin distribution. Yet again, Jones's attorney sat on his hands. If, at that moment, she had been represented by a minimally effective attorney, the result in the case--Jones's conviction for a crime carrying a mandatory life sentence--surely would have been different.

The majority opinion has indeed examined in great detail each tree in the forest of this travesty. But in giving such great detail to each tree, the view of the forest--that this petitioner was doomed to a mandatory life sentence conviction only and solely

*because of a completely ineffective counsel--is somehow lost on the majority.  That is regrettable.*

*I respectfully dissent.*